**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 190315-U

Order filed February 25, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-19-0315 Circuit No. 17-CF-344 |
| FANTASIA MICHELLE WATSON, | ) ) ) | Honorable Kevin W. Lyons, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HOLDRIDGE delivered the judgment of the court.
Presiding Justice O'Brien and Justice Hauptman concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:   The admission of the defendant's retail theft offense was not reversible plain error, and the defendant did not receive ineffective assistance of counsel.

¶ 2    The defendant, Fantasia Michelle Watson, appeals from her conviction for aggravated domestic battery. The defendant argues that the Peoria County circuit court erred where it allowed the State to impeach her with a prior retail theft offense. She also argues her trial counsel was ineffective for failing to properly object to the admission of the retail theft offense.

¶ 3                                    I. BACKGROUND

¶ 4        The defendant was charged with attempted first degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2016)) and aggravated domestic battery (*id.* § 12-3.3(a-5)).

¶ 5        At the bond hearing on April 20, 2017, the prosecutor informed the court that he did not believe that the defendant had a criminal record. During a subsequent hearing on the defendant's motion to reduce bond, the defendant testified that she had a 2014 misdemeanor retail theft charge from Sangamon County.

¶ 6        The morning of the defendant's jury trial, the State made an oral motion to use the defendant's prior retail theft charge as impeachment evidence. The State informed the court and defense counsel that it had reviewed a certified copy of conviction from Sangamon County. Though the State initially thought the defendant received court supervision and no conviction was entered, the State explained that the supervision was revoked, "which means it would be a conviction." Defense counsel stated that he did not know that the Sangamon County case resulted in a conviction, and that he would need to discuss the matter with the defendant.

¶ 7        Detective Seth Landwehr of the Peoria Police Department testified that he was dispatched to Unity Point Methodist Hospital on April 18, 2017, regarding a woman who had attempted to smother a baby. Landwehr learned that the victim was the defendant's son, D.N., who was born on May 3, 2016. The defendant was a patient at the hospital and had given birth to another child, Z.N., on April 17, 2017.

¶ 8        Peoria Police Officer Cristian Munoz testified that on April 18, 2017, he was dispatched to Unity Point Methodist Hospital. After speaking with a nurse about what had occurred, Munoz placed the defendant under arrest and transported her to the police department.

¶ 9        Melissa Cipolla, a registered nurse, testified that she was working at Unity Point Methodist Hospital on April 18, 2017. Cipolla was assigned to care for the defendant and Z.N. At approximately 12 p.m., Z.N.'s father brought D.N. to the defendant's hospital room.[1] Z.N.'s father left at approximately 4 p.m., leaving D.N. in the room with the defendant. D.N. was in the patient bed each time Cipolla went to the defendant's room. Cipolla received clearance to discharge the defendant. While discussing the discharge with the defendant, Cipolla observed the defendant "[f]irmly grasp" D.N.'s upper arms, shove him back into the hospital bed and tell him to be quiet. Cipolla was concerned and left the room to tell the charge nurse what had happened.

¶ 10        Cipolla went back to the defendant's room to discuss the discharge paperwork with the defendant. Uncomfortable with the decision to discharge the defendant, Cipolla left the room to speak with the charge nurse again. After realizing that she had forgotten paperwork in the room, Cipolla returned to the defendant's room. Upon entering the room, Cipolla saw the defendant leaning over D.N., holding a pillow over his face. D.N. was laying sideways on the bed and the pillow "completely covered" his face. The defendant's elbows were locked and she was applying pressure with both hands. D.N. was not making any noise. There were two other pillows at the head of the bed. The defendant was startled when she saw Cipolla and then she lifted and threw the pillow. D.N. took a big breath and started screaming. Cipolla asked the defendant what she was doing. Although Cipolla could not remember the defendant's initial response, the defendant indicated that D.N. would not be quiet. Cipolla asked the defendant, "So you decided to take a pillow to his face?" The defendant replied, "The little bitch wouldn't be quiet." Cipolla told the

_____

[1]Cipolla referred to D.N. as the 11-month-old child throughout her testimony because the defendant refused to tell her the child's name.

3

defendant that she was not being discharged and left the room to call security. Cipolla returned to the room with a security guard and stayed until other security and hospital personnel arrived.

¶ 11    Before the defendant's testimony, the court asked the parties what their understanding was as to the defendant's criminal history. Defense counsel responded that he believed that the defendant had a prior "retail theft misdemeanor that she was—appears to be convicted of; originally received court supervision, but that appears to have been revoked." Defense counsel objected to the State impeaching the defendant with her prior retail theft because the crime was a misdemeanor which did not apply to her truthfulness and was more prejudicial than probative. The court decided that the retail theft would be allowed for impeachment purposes.

¶ 12    The defendant testified that she gave birth to Z.N. at Unity Point Methodist Hospital on April 17, 2017. The following day, the defendant met Cipolla. The defendant's husband, Denota Nichols, came to the hospital with their son, D.N. Nichols spent several hours at the hospital before leaving. Nichols left D.N. in the hospital room with the defendant. The defendant did not recall grabbing D.N.'s arms or pushing him back into the bed. While Cipolla read the defendant's discharge papers, the defendant arranged the pillows on the side of the bed so that D.N. would not roll over and fall through the holes on the bed. D.N. was laying at the top of the hospital bed. After Cipolla left the room, D.N. rolled over to grab the defendant's arm and a pillow fell on top of him. The defendant was removing the pillow when Cipolla returned. The defendant threw the pillow and Cipolla ran out of the room. The defendant denied telling Cipolla that "the bitch wouldn't be quiet." The defendant denied trying to hurt or kill D.N. The defendant remembered speaking to Landwehr on April 18, 2017. The defendant did not remember responding "yeah" after Landwehr asked if she had placed the pillow on top of D.N.'s face. The

4

defendant also did not remember telling Landwehr that she did not have the pillow on D.N.'s face for very long or that she had just put it on when Cipolla walked in.

¶ 13    In rebuttal, the State tendered an exhibit of the retail theft offense. To the jury, the court stated, "it appears to be a certified copy of a conviction of the defendant *** in 2014 for the offense of retail theft" and asked the State if that was correct. The State responded affirmatively. The court admitted the exhibit over the defendant's prior objection and informed the jury that it would receive an instruction as to how to consider the conviction. The nine-page document indicated that the defendant was charged with retail theft on June 30, 2014, in Sangamon County. The defendant pled guilty and was sentenced to six months' court supervision. The October 28, 2014, docket entry stated that the disposition in the defendant's case was "Revocation/Vacate/Supervision RETAIL THEFT," and that "No Sentence" was entered. The document also contained an order signed by a judge which stated, "Convert to Civil Judgment" and "Revoke Supervision."

¶ 14    The State recalled Landwehr, who testified that he interviewed the defendant at the police department on April 18, 2017. The interview was recorded, and Landwehr reviewed the video before the trial. Landwehr stated that he asked the defendant, "did you just put the pillow on top of his face?" The defendant replied, "yeah." When Landwehr asked the defendant how long she had the pillow on D.N.'s face, she replied, "I didn't have it on there long; I had just put it on and she walked in." The questions and responses occurred approximately 90 to 120 minutes into the interview when the defendant was in an emotional state and crying.

¶ 15    In closing argument, the prosecutor commented that the jury would have to decide the believability of the witnesses and asked the jury to consider the defendant's demeanor while

5

testifying, to compare the motives and biases of the witnesses, and to consider the reasonableness of the testimony.

¶ 16    The court instructed the jury that it could consider evidence of the defendant's prior conviction "only as it may affect her believability as a witness and must not be considered by you as evidence of [her] guilt of the offense with which she is charged."

¶ 17    The jury found the defendant guilty of aggravated domestic battery and not guilty of attempted first degree murder. The court sentenced the defendant to nine years' imprisonment. The defendant appeals.

¶ 18                                    II. ANALYSIS

¶ 19                              A. Retail Theft Admission

¶ 20    The defendant argues that the circuit court erred when it admitted her retail theft offense for impeachment purposes because the offense did not result in a conviction and thus, was improperly used to impeach her testimony at trial. The defendant acknowledges that she forfeited review of this issue by failing to include it in a posttrial motion, but asks for review under both prongs of the plain error doctrine.

¶ 21    The first step of the plain error doctrine is determining whether a "plain error" occurred. *People v. Piatkowski*, 225 Ill. 2d 551, 564-65 (2007). "The word 'plain' here is synonymous with 'clear' and is the equivalent of 'obvious.' " *Id.* at 565 n.2. If a reviewing court determines that the circuit court committed a clear or obvious error, the next step is to determine whether that plain error is reversible. *Id.* at 566. A plain error is reversible when (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) the error is "so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of

6

the closeness of the evidence." *Id.* at 565. We begin by determining whether the admission of evidence of the defendant's prior retail theft offense was a plain error.

¶ 22    Generally, evidence of a witness's prior conviction is admissible to impeach the witness's credibility where: (1) the prior crime was punishable by death or imprisonment in excess of one year, or involved dishonesty or false statement regardless of the punishment; (2) less than 10 years elapsed since the date of the prior conviction or release of the witness from confinement, whichever is later; and (3) the probative value of admitting the prior conviction is substantially outweighed by the danger of unfair prejudice. *People v. Montgomery*, 47 Ill. 2d 510, 516 (1971); see also Ill. R. Evid. 609 (eff. Jan. 6, 2015); Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 23    At issue in this case is whether the defendant's prior retail theft offense constituted a conviction for purposes of impeachment. The State's exhibit established that the defendant was charged with retail theft in 2014. The June 30, 2014, docket entry included in the exhibit indicated that the defendant pled guilty to this offense and was sentenced to six months of court supervision. If the defendant successfully completed this period of court supervision, a conviction would not have been entered, and the offense could not be used for impeachment. See *People v. Schuning*, 106 Ill. 2d 41, 48 (1985). The October 28, 2014, docket entry states "Revocation/Vacate/Supervision RETAIL THEFT" and "No Sentence." An order from the same date states "Convert to Civil Judgment" and "Revoke Supervision." None of the pages in the exhibit indicate that following the revocation of the defendant's supervision, the court entered a conviction. Because the record fails to establish that the defendant's retail theft offense resulted in a conviction, the court erroneously allowed the State to impeach the defendant with this evidence.

¶ 24    Having found the court committed a clear or obvious error, we must next determine whether this error is reversible under either prong of the plain error doctrine. Under the first prong, we must determine whether the evidence is closely balanced by "evaluat[ing] the totality of the evidence and conduct[ing] a qualitative, commonsense assessment of it within the context of the case." *People v. Sebby*, 2017 IL 119445, ¶ 53. This inquiry "involves an assessment of the evidence on the elements of the charged offense ***, along with any evidence regarding the witnesses' credibility." *Id.* Evidence is closely balanced where both parties present plausible opposing versions of events, neither of which was corroborated by extrinsic evidence. *People v. Olla*, 2018 IL App (2d) 160118, ¶ 34.

¶ 25    In this case, the defendant was convicted of aggravated domestic battery. To prove the defendant guilty, the State needed to establish that the defendant (1) knowingly caused bodily harm to the victim or made physical contact of an insulting or provoking nature; (2) that she did so by strangling him[2]; (3) that the minor was family or household member; and (4) that the defendant was not justified in using the force she used. See 720 ILCS 5/12-3.2(a), 12-3.3(a-5) (West 2016).

¶ 26    The defendant contends that the evidence was closely balanced because the trial's outcome turned on a credibility contest between the defendant and Cipolla. Although the parties did present opposing versions of events, we find the defendant's version implausible. According to the defendant, a pillow fell on top of D.N.'s face as he rolled over and grabbed her arm. The defendant was removing the pillow when Cipolla entered the room. Not only was the defendant's

---

[2]Here, "strangle" means intentionally impeding the normal breathing of an individual by blocking the nose or mouth. See 720 ILCS 5/12-3.3(a-5) (West 2016).

testimony vague; it was also unbelievable that an 11-month-old child would be smothered by a pillow as the defendant described.

¶ 27    On the other hand, the State's evidence was strong. Cipolla's testimony was consistent, and her version of events was credible. Cipolla testified that she observed the defendant holding the pillow over D.N.'s face. The defendant's elbows were locked and she was applying pressure with both hands. After the pillow was removed from D.N.'s face, he took a big breath and started to cry. Moreover, Cipolla's testimony was bolstered by Landwehr's testimony regarding the defendant's statements made during the recorded interview. Landwehr testified that the defendant admitted to putting the pillow on top of D.N.'s face. The defendant also said "I didn't have it on there long; I had just put it on and she walked in." Applying a commonsense assessment, we conclude that the evidence was not closely balanced.

¶ 28    Reversible error under the second prong of the plain error doctrine has been equated with "structural error." *People v. Thompson*, 238 Ill. 2d 598, 613-14 (2010). The supreme court has defined "structural error" as "a systemic error which serves to 'erode the integrity of the judicial process and undermine the fairness of the defendant's trial.' " *Id.* (quoting *People v. Glasper*, 234 Ill. 2d 173, 197-98 (2009), quoting *People v. Herron*, 215 Ill. 2d 167, 186 (2005)). Where a defendant shows the error was so serious that it affected the fairness of the trial and challenged the integrity of the judicial process, " '[p]rejudice *** is presumed because of the importance of the right involved.' " *Sebby*, 2017 IL 119445, ¶ 50 (quoting *Herron*, 215 Ill. 2d at 187). Structural error occurs in a limited class of cases such as, "a complete denial of counsel, denial of self-representation at trial, trial before a biased judge, denial of a public trial, racial discrimination in the selection of a grand jury, and a defective reasonable doubt instruction." *People v. Averett*, 237 Ill. 2d 1, 13 (2010).

9

¶ 29       The alleged error in the instant case does not fall within one of the structural error

examples described above nor is it of the same magnitude as a structural error. Simply put, the

evidentiary error did not challenge the integrity of the judicial process or deprive the defendant

of her right to a fair trial. Moreover, any prejudice that may have resulted from the admission of

the defendant's prior retail theft offense was limited as the prior offense was not emphasized at

trial and was not mentioned by the State in its closing argument.

¶ 30                                    B. Ineffective Assistance

¶ 31       The defendant also argues that she received ineffective assistance where her counsel

failed to properly object to the admission of the retail theft offense. Although defense counsel

objected to its admission, the defendant contends that defense counsel should have objected on

other grounds as "it should have been obvious to counsel that the retail theft case did not result in

a conviction."

¶ 32       To prevail on an ineffective assistance of counsel claim, the defendant must demonstrate

that counsel's performance was deficient, and that the defendant was prejudiced as a result.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish prejudice, the defendant must

show that, but for counsel's deficient performance, there is a reasonably probability that the

outcome of the proceeding would have been different. *Id.* at 694.

¶ 33       Our supreme court has held that the prejudice prong for ineffective assistance is similar to

the first prong of plain error. *People v. White*, 2011 IL 109689, ¶ 134. Thus, "where a defendant

fails to show prejudice, a defendant's allegations of ineffective assistance of counsel and plain

error under the closely-balanced-evidence prong both fail." *People v. Hensley*, 2014 IL App (1st)

120802, ¶ 47 (citing *White*, 2011 IL 109689, ¶ 134). Because we have already found that the

defendant was not prejudiced by the admission of the retail theft under the first prong of plain

10

error, we also find that the defendant's ineffective assistance of counsel claim fails. There is no reasonable probability that the outcome of the proceeding would have been different had defense counsel objected to the admission of the retail theft on the basis that it was not a conviction.

¶ 34                                     III. CONCLUSION

¶ 35            The judgment of the circuit court of Peoria County is affirmed.

¶ 36            Affirmed.